**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ANA MARIE CERVANTES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 12 C 2397** |
| ) | |
| **CAROLYN W. COLVIN, Acting** ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ana Marie Cervantes seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff has now filed a motion for summary judgment. After careful review of the record, the Court grants Plaintiff's motion and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on July 17, 2008, alleging that she became disabled on March 25, 2008 due to bipolar disorder, diabetes and high

---

[1] Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

cholesterol. (R. 139, 142, 190).[2] The Social Security Administration denied the applications initially on August 28, 2008, and again upon reconsideration on November 24, 2008. (R. 76-84, 89-94). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Joel G. Fina (the "ALJ") on August 17, 2010. (R. 34). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from medical expert Kathleen M. O'Brien, Ph.D. (the "ME") and vocational expert Ruben Luna (the "VE"). Shortly thereafter, on October 26, 2010, the ALJ found that Plaintiff is not disabled because there are a significant number of light jobs she can perform. (R. 19-27). The Appeals Council denied Plaintiff's request for review on January 26, 2012, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ: (1) made a flawed credibility assessment; (2) erred in rejecting the opinion of her treating psychiatrist; and (3) failed to properly consider her diabetes and obesity in determining her residual functional capacity ("RFC"). As discussed below, the Court finds that Plaintiff's first argument is well-taken, and the case must be remanded for further evaluation.

## FACTUAL BACKGROUND

Plaintiff was born on May 17, 1967, and was 43 years old at the time of the ALJ's decision. (R. 186). She has a high school diploma and spent 13 years

---

[2] Plaintiff initially alleged a disability onset date of May 17, 1985, but amended it through counsel on August 17, 2010. (R. 185, 186).

working as a department manager, most recently at Jewel-Osco.  (R. 40, 191).

She quit that job on March 3, 2007 because she was mentally unable to handle

it.  (R. 41, 48).

## A.    Medical History

Plaintiff has a history of bipolar disorder dating to her late teens.  (R. 48).

She started treating with Michael Brilliant, M.D., of Alexian Brothers Behavioral

Health Hospital on January 17, 2002, and had regular 15-minute appointments

with him for the next 7 1/2 years.  (R. 429).  From 2002 through 2006, Plaintiff

saw Dr. Brilliant at approximately one- or two-month intervals, and was often

feeling "pretty good" and enjoying things, though she had some problems

sleeping.  (R. 393-426).  By January 24, 2007, Plaintiff was feeling "fine" and

sleeping "good."  Her medications included Geodon and Depakote for the bipolar

disorder, and temazepam for sleep.  She was able to enjoy things, her weight

was stable, and her concentration was "okay" at that time.  Her energy level was

low, but Dr. Brilliant said that she did not need to return for 7 months.  (R. 392).

When Plaintiff returned to Dr. Brilliant on July 2, 2007, she was feeling

"pretty good" and enjoying things, though she still complained about a lack of

energy.  (R. 391).  At a November 10, 2007 visit, Plaintiff was "stable," reporting

that she was feeling fine and enjoying things.   Dr. Brilliant described her

concentration as okay and noted that she was "sleeping a lot."  (R. 390).

### 1.    2008

Plaintiff next saw Dr. Brilliant on January 3, 2008.  She continued to do

"relatively well" but complained of "low energy level" and poor concentration.

She also described feeling hopeless and helpless, and Dr. Brilliant increased her dosage of Depakote. (R. 315, 377, 389). By March 26, 2008, Plaintiff had stopped working and was feeling "anxious about going back to work." Her concentration was poor at that time, but her mood was "fine," her weight was stable, and she was enjoying things to some degree and "sleeping okay." (R. 314, 376, 388).

When Plaintiff returned to Dr. Brilliant on May 28, 2008, she was "stressed out" because her son had accused her of using drugs, which turned out to be untrue. Her weight was stable but her concentration was poor and she was not enjoying things. She also complained of feeling hopeless, helpless and worthless. (R. 313, 375, 387). On June 25, 2008, Plaintiff told Dr. Brilliant that she had insomnia, with racing thoughts at night. She was also experiencing an increased level of anxiety and "medium" concentration, though she reported "[g]oing to school 5-6 h/day." (R. 312, 374, 386).

The following month, on July 17, 2008, Plaintiff filed for disability benefits. The same day, she was admitted to Provena Saint Joseph Hospital for depression, high anxiety and inability to sleep. She reported having an "increase in suicidal thinking, with overwhelming thoughts to overdose on her medication." Her mind was racing, she was unable to sleep or be comfortable, and she was "unable to contract for her own safety." (R. 269, 323). The doctors adjusted her medications by increasing her Geodon, starting her on trazodone, and changing her Depakote to pill form. Over the next few days, her mood improved, she was able to sleep well through the night and she no longer had any suicidal or

homicidal ideations.  She also denied any auditory or visual hallucinations.  (*Id.*).

Plaintiff was discharged on July 21, 2008 with a diagnosis of "[b]ipolar disorder,

depressed, with psychotic features" and diabetes mellitus.  Her Global

Assessment of Functioning ("GAF") score was 55.[3]  (*Id.*).

Approximately one month later, on August 26, 2008, Carl Hermsmeyer,

Ph.D., completed a Psychiatric Review Technique of Plaintiff for the Bureau of

Disability Determination Services ("DDS").  (R. 353-66).  Dr. Hermsmeyer found

that Plaintiff has mild limitations in activities of daily living and moderate

difficulties in maintaining social functioning, concentration, persistence or pace.

(R. 363).  Based on Dr. Brilliant's treatment notes, Dr. Hermsmeyer concluded

that Plaintiff suffers from anxiety, insomnia, poor concentration, and feelings of

hopelessness, but that she "is able to do most all her [activities of daily living]

independently."  In that regard, Dr. Hermsmeyer noted that Plaintiff was "going to

school 5-6 days a week."  (R. 365).  In a Mental Residual Functional Capacity

Assessment completed the same day, Dr. Hermsmeyer concluded that Plaintiff is

moderately limited in her ability to understand, remember and carry out detailed

instructions, but otherwise not significantly limited in any mental area.  (R. 367-

68).  The next day, on August 27, 2008, Charles Kenney, M.D., found that

Plaintiff's diabetes is controlled with medication, she has no end organ damage,

and her condition "does not limit her" activities of daily living.  (R. 352).

---

[3]     "The GAF scale reflects a clinician's assessment of an individual's symptom
severity or level of social, occupational, or school functioning.  American Psychiatric
Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text
Rev. 2000). . . . A GAF score of 51 to 60 means some moderate symptoms or moderate
difficulty in functioning."  *Thomas v. Astrue*, No. 11 C 3055, 2012 WL 359731, at *1 (C.D.
Ill. Feb. 2, 2012).

Plaintiff next saw Dr. Brilliant on October 10, 2008, reporting that she was "doing better" and sleeping okay with stable weight. At the same time, her mood was "so-so," she was feeling depressed at times and not enjoying things too much, her energy level was low, her concentration was poor and she was feeling helpless and hopeless. (R. 373, 385). On November 7, 2008, Plaintiff's mood was better and she was enjoying some activities, though her concentration was "up and down" and she still had feelings of hopelessness and helplessness. Plaintiff complained of insomnia and poor energy level, but denied having racing thoughts. (R. 384).

Shortly thereafter, on November 13, 2008, Chansoo Kim, M.D., affirmed Dr. Kenney's determination that Plaintiff is not disabled from diabetes. (R. 379-80).

### 2. 2009 through 2010

Plaintiff's next 15-minute appointment with Dr. Brilliant was on January 21, 2009. She reported finding it "hard to focus and concentrate at school," and she was not sleeping well. Her energy level was low, her mood was "on and off," and she was feeling sad, hopeless and helpless and not enjoying things as much as she used to. (R. 383). Plaintiff was still "not feeling too good" on April 23, 2009, with feelings of hopelessness and helplessness. She also complained of being tired and sleepy during the day and being unable to sleep at night. (R. 382). The sleeping problems continued as of May 21, 2009. Dr. Brilliant noted that Plaintiff's mood was "even to racing thoughts" and her concentration was "okay,

but at times is not good." (R. 550). He decreased her dosage of Depakote but continued her on the same level of Geodon and temazepam. (*Id.*).

At a visit on June 18, 2009, Plaintiff asked Dr. Brilliant to complete disability forms for her. (R. 549). The following month, on July 28, 2009, Plaintiff started receiving psychiatric care from Aunt Martha's Youth Service Center ("Aunt Martha's"). (R. 462-64). During the initial psychiatric evaluation, Plaintiff reported that she was having trouble sleeping despite taking temazepam. Her energy level was low but her mood was stable and she had no depressive episodes. That said, she was depressed that her children were living with her ex-husband and she could not see her two older kids. (R. 462). Plaintiff's symptoms included euphoria, irritability, rages/meltdowns, rapid mood changes, pressured speech and thoughts, giddy inappropriate laughing, interpersonal sensitivity, violence and anger towards her ex-husband, and insomnia. (R. 463). She last had auditory or visual hallucinations in June 2007 and was "overall fairly stable." The doctor (name illegible) noted that Plaintiff's mood was euthymic but agitated, and she was groomed with good insight, good judgment and linear thinking. (R. 464). The doctor started her on Wellbutrin in addition to her other medications. (*Id.*).

Plaintiff returned to Aunt Martha's for a follow-up visit on August 25, 2009. She was "still down but not as depressed," and said she became "angry easily" with her kids. The doctor described Plaintiff's affect as sad and nonreactive, but her judgment and insight were both good. Since Plaintiff did not report any side effects from the Wellbutrin, the doctor increased her dosage. (R. 460). On

October 6, 2009, Plaintiff remained "stable overall" and was trying to diet and eat less. (R. 458). Two months later, on December 1, 2009, she was still stable but wanted to take the Wellbutrin later in the day because she was "sleep[ing] in a lot." She denied having any other symptoms at that time. (R. 457).

At Plaintiff's next visit to Aunt Martha's on January 26, 2010, her mood was good even though she had stopped taking Wellbutrin. She denied having any side effects from the medications or any other symptoms, and the doctor assessed her as "stable." (R. 454). A few months later, on April 27, 2010, Plaintiff complained of some mood swings but the doctor again described her as stable. (R. 449).

On May 20, 2010, Dr. Brilliant completed a Mental Impairment Questionnaire in connection with Plaintiff's application for disability benefits. (R. 433-36). Though he did not provide any records past June 2009, Dr. Brilliant indicated that he had been treating Plaintiff continuously from January 2002 through the date of the questionnaire. (R. 433). He diagnosed her with Bipolar I disorder, assigned her a GAF score of 45,[4] and stated that she has a host of symptoms, including poor memory, appetite and sleep disturbance, mood disturbance, anhedonia, paranoia, difficulty thinking or concentrating, time or place disorientation, decreased energy, persistent irrational fears, hostility and irritability, and pathological dependence or passivity. (R. 433). With respect to his clinical findings, Dr. Brilliant observed that Plaintiff has fair hygiene and is

---

[4]     "A GAF score of 41 to 50 means serious symptoms or serious difficulty in functioning." *Thomas*, 2012 WL 359731, at *1.

cooperative and coherent, but she has a "sad affect" and her prognosis is guarded." He also reported that her medications cause drowsiness, stomachaches and diarrhea. (R. 434).

Dr. Brilliant opined that Plaintiff would miss work more than three times a month, and that she has no useful ability to: remember work-like procedures; understand, remember and carry out very short and simple instructions; maintain attention for two-hour segments; maintain regular attendance and be punctual; sustain an ordinary routine; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace; respond appropriately to changes in a routine work setting; and deal with normal work stress. (R. 434-35). She is also "seriously limited but not precluded" in her ability to: work in coordination with or proximity to others without being unduly distracted; ask simple questions or request assistance; accept instructions and respond appropriately to criticism; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and be aware of normal hazards and take appropriate precautions. (R. 435).

In addition to these limitations, Dr. Brilliant indicated that Plaintiff has marked restrictions in her activities of daily living, marked difficulties in maintaining social functioning, and constant deficiencies of concentration, persistence or pace. He further opined that she has "[c]ontinual" episodes of deterioration or decompensation "in work or work-like settings that cause [her] to withdraw . . . or to experience exacerbation of signs and symptoms." (R. 436).

Shortly after the August 17, 2010 hearing before the ALJ, Dr. Brilliant submitted a supplemental opinion regarding Plaintiff's mental health. In a letter dated September 3, 2010, Dr. Brilliant said that Plaintiff "is currently a patient under my care" and "[h]er condition is relatively stable and she can be managed on an outpatient basis." (R. 554). Nevertheless, Dr. Brilliant opined that Plaintiff's everyday functioning is "significantly impaired." She experiences "a number of side effects from the medications," including sleepiness during the day and an inability to sleep at night. She also complains of "difficulty focusing and concentrating, difficulty following instructions, and being easily distractible." (*Id.*). Dr. Brilliant stated that Plaintiff has poor motivation, marked impairment in her ability to perform activities of daily living and to maintain social functioning, and constant deficiencies of concentration and pace. (*Id.*). In Dr. Brilliant's view, Plaintiff is "not able to sustain any type of full-time, competitive employment, including unskilled work." (*Id.*).

## B.    Plaintiff's Testimony

In a July 27, 2008 Function Report completed in connection with her application for disability benefits, Plaintiff stated that she sleeps on and off throughout the day because she is unable to sleep at night. (R. 223). Either her fiancé or her mother prepares her meals, and she does very few chores, "if at all." (R. 225). Plaintiff stated that she bathes every other day and finds it hard to dress due to a lack of willpower. (R. 224). She needs reminders to take her medicine, bathe, and wash her clothes, and she goes out "very little or not at all" because of depression and lack of strength. (R. 225-26). Though Plaintiff

sometimes shops for food or clothes, she does not drive and finds it hard to understand directions. (R. 226). She spends "very little" time with her children, fiancé and mother and describes herself as a loner. (R. 227-28). In a Physical Impairments Questionnaire completed the same day, Plaintiff stated that she lacks the concentration and energy needed to read, (R. 219), and denied being able to sit for at least 2 hours. (R. 220).

At the August 17, 2010 hearing before the ALJ, Plaintiff testified that she stopped working at Jewel-Osco on March 3, 2007 because she "couldn't handle it" anymore. (R. 40-41). Plaintiff explained that prior to quitting, she had tried reducing her hours and switching to a different department, but she was unable to concentrate and kept getting paranoid and overwhelmed. (*Id.*). On a typical day, Plaintiff cannot get to sleep until 2:00 a.m. due to insomnia so she wakes up around 2:00 in the afternoon. Her fiancé leaves messages on the refrigerator to remind her to shower and take her medication, and he washes and chooses her clothes for her. (R. 43, 44, 52). He also gives her a list of chores to do during the day while he is at work, such as washing dishes, throwing out the garbage, sweeping and vacuuming. Plaintiff tries to "do as much as I can, but it seems like I don't have that enthusiasm and the willpower to do them." (R. 43). As a result of her depression, Plaintiff does the chores "halfway" and her fiancé "does the rest of it." (*Id.*).

Plaintiff testified that she can make cold sandwiches for herself, but usually her fiancé prepares her food. (R. 53). She is not able to concentrate enough to watch television, so she tries to color in a coloring book to "ease the

depression that I get during the day." (R. 44). Plaintiff's children do come stay with her every two weeks or so, but she sends them out on their own under the care of her 16-year-old daughter. (R. 53-54). Plaintiff finally noted that she has gained weight on her medications, going from 140 to 260 pounds, (R. 51), and that they merely "keep me from being suicidal" but "[t]hat's about it." (R. 52).

## C.     Medical Expert's Testimony

Dr. O'Brien testified at the hearing as an ME. She opined that Plaintiff has mild difficulties with activities of daily living and moderate difficulties with social interaction, concentration, persistence and pace. (R. 56). As a result, Plaintiff would be limited to performing unskilled tasks at an average, as opposed to an enhanced production pace, and she can have only occasional contact with the public and "average" contact with supervisors and peers. (R. 57). The ME acknowledged Dr. Brilliant's May 2010 opinion, but found that the treatment notes do not support such extreme limitations. (R. 58). By way of example, the ME observed that Plaintiff was consistently "doing pretty well" and "fairly stable," and that Dr. Brilliant decreased her Depakote in May 2009. (*Id.*).

In response to questioning from Plaintiff's counsel, the ME agreed that Dr. Brilliant's notes do not explain why he decreased her medication. Nevertheless, the ME emphasized that the "global picture" does not give any indication that Plaintiff's condition is worsening. (R. 59-61). Plaintiff does report poor sleep, low energy, lack of concentration and feelings of hopelessness and helplessness, but the ME described these as "relative" and not an actual "level of functioning." (R. 65-66). In the ME's view, a person functioning as poorly as indicated in Dr.

Brilliant's report would require institutionalization or a much higher level of care. Yet Dr. Brilliant did not even recommend that Plaintiff begin therapy. (R. 66-67).

**D.      Vocational Expert's Testimony**

Mr. Luna testified at the hearing as a VE. The ALJ asked him to consider a hypothetical person of Plaintiff's age, education and past work experience who can occasionally lift 20 pounds and frequently lift 10 pounds, but who is limited to performing simple, routine, and repetitive tasks at an average pace, with only occasional interaction with the public. (R. 71-72). The VE testified that such a person would not able to perform Plaintiff's past work, which was semi-skilled, but could still work as a routing clerk or sorter (34,000 jobs available) or a garment bagger (52,000 jobs available). (R. 72). If the individual were unable to sustain sufficient concentration, persistence or pace to do even simple, routine tasks in a regular workday, however, there would be no jobs available. (R. 72-73).

**E.      Administrative Law Judge's Decision**

The ALJ found that Plaintiff's bipolar disorder and diabetes mellitus are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 22-23). After reviewing the medical records from January 2008 through April 27, 2010, the ALJ described Plaintiff's symptoms as "fluctuating," and concluded that she has only mild restrictions in activities of daily living, and moderate restrictions in social functioning, concentration, persistence or pace. (*Id.*). The ALJ thus determined that Plaintiff has the capacity to perform light work with the following restrictions:

she is limited to jobs involving simple, routine and repetitive tasks; she can have only occasional interaction with the general public; and she can only work at an average pace without enhanced production rate requirements. (R. 23).

In reaching this conclusion, the ALJ acknowledged Dr. Brilliant's May and September 2010 opinions but failed to discuss any of his specific findings or give them any weight. (R. 25). The ALJ instead relied entirely on the ME's testimony that "the treatment records do not reflect th[e] level of severity" set forth in Dr. Brilliant's reports. (*Id.*). Specifically, the ALJ accepted the ME's view that the treatment notes "indicate that in general [Plaintiff] is doing fairly well and is fairly stable," despite some episodes of increased symptomology. (*Id.*). The ALJ also concluded that Plaintiff's medications have been "relatively effective in controlling [her] symptoms," and that her activities of daily living do not support her claims of disabling limitations. (R. 24-25).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing a significant number of unskilled light jobs available in the national economy, including routing clerk (34,000 jobs available) or garment bagger (52,000 jobs available). (R. 26). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## **DISCUSSION**

### A.     **Standard of Review**

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing

this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.    Five-Step Inquiry**

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar.

10, 2008).[5]  A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009).  In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff claims that the ALJ's decision must be reversed because he: (1) made a flawed credibility assessment; (2) erred in rejecting the opinion of her treating psychiatrist; and (3) failed to properly consider her diabetes and obesity in determining her RFC.

### 1.    Credibility Assessment

Plaintiff first objects to the ALJ's decision to discount her testimony.  In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence.  *See* SSR 96-7p, at *2; *Arnold v.*

---

[5]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

*Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

As a preliminary matter, the Court notes that the ALJ included the following language in his credibility analysis: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [stated] residual functional capacity assessment." (R. 24). The Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless boilerplate," but ALJs continue to use it in their decisions. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Each time they do so, plaintiffs and their counsel seize on the language as evidence that the credibility finding is backwards and defective. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies

that ability to work is determined first and is then used to determine the claimant's credibility.  That gets things backwards.").

The Court agrees that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis.  *Shauger*, 675 F.3d at 696.  Where, as here, however, the ALJ provides a detailed discussion of the plaintiff's symptoms and testimony, and the reasons he did not find the plaintiff's statements fully credible, the use of the boilerplate template does not alone provide a basis for remand.  *See, e.g., Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) (the boilerplate language is "inadequate, by itself, to support a credibility finding," but decision affirmed where "the ALJ said more.").  Plaintiff's argument to that effect is rejected.

Turning to the ALJ's substantive analysis, he first concluded that Plaintiff's complaints of disabling limitations "are not supported by the medical records." (R. 24).  By way of explanation, the ALJ noted that "[t]he psychiatric progress notes reflect numerous occasions on which the claimant did not specify any particular complaint, or mild complaints, which contrast with the current claim of ongoing, disabling symptoms."  (*Id.*).  The problem with this assessment is that it appears to ignore Plaintiff's repeated reports of low energy, insomnia, excessive daytime sleeping, mood and concentration problems, inability to enjoy things, and feelings of helplessness and hopelessness.  (R. 312, 313, 315, 373, 382-84, 390-92, 449, 457, 460, 550).  At step two of the analysis, the ALJ cited some of this evidence, (R. 22), but he omitted any reference to the hopelessness and

helplessness, and offered no explanation as to why Plaintiff's stated symptoms amount to only "mild complaints" that undermine her credibility.

More troubling is the ALJ's assertion that Plaintiff's "activities of daily living are inconsistent with her complaints." (R. 24). In that regard, the ALJ noted that Plaintiff "does do household chores such as taking out the garbage, sweeping, vacuuming and washing dishes." (*Id*.). In fact, Plaintiff testified that she needs reminders not only to do chores, but also to bathe, dress and take her medication. (R. 43, 44, 52). She further stated that she only does the chores "halfway" because she lacks the "willpower to do them," and then her fiancé "does the rest of it." (R. 43). The ALJ said nothing about these memory limitations, or Plaintiff's need for help completing tasks. The Seventh Circuit has made it clear that a plaintiff's "ability to struggle through activities of daily living does not mean that she can manage the requirements of a modern workplace." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). This is especially true if the activities "can be done only with significant limitations," *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013), since a person has more flexibility in scheduling [activities of daily living than work activities], can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson*, 671 F.3d at 647. The ALJ's failure to acknowledge Plaintiff's testimony that she cannot complete her chores and needs reminders to start them constitutes reversible error in this case.

In a similar vein, the ALJ erred by emphasizing evidence of "some indication that [Plaintiff] was going to school in 2008." (R. 24). In June 2008, Dr.

Brilliant indicated that Plaintiff was "going to school 5-6 h/day," (R. 386), but the following month she was hospitalized for depression, high anxiety and suicidal thoughts. (R. 323). The only other mention of school is from January 2009, when Plaintiff told Dr. Brilliant that she was finding it "hard to focus and concentrate at school." (R. 383). In the absence of any evidence regarding the nature and extent of Plaintiff's studies, however, it is not clear whether this fairly undermines her claim of disabling symptoms.

Defendant argues that even if these reasons for discounting Plaintiff's testimony were flawed, other explanations support the finding. (Doc. 25, at 8) (citing *Halsell v. Astrue*, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as *enough* of them are.")) (emphasis in original). For example, the ALJ observed that Plaintiff's medications have been "relatively effective in controlling [her] symptoms, requiring few dosage or medication adjustments." (R. 25). Of course, the ALJ also acknowledged that Plaintiff's use of medications "weighs in [her] favor," (*Id.*), and he ignored her testimony that they merely keep her from being suicidal but "[t]hat's about it." (R. 52). In addition, though the ME concluded based on the medical records that Plaintiff is "fairly stable" and capable of performing simple, unskilled tasks at an average pace, "an ALJ may not discount a Claimant's credibility solely on the basis of objective medical evidence." *Jensen v. Astrue*, No. 11 C 4423, 2012 WL 6642449, at *12 (N.D. Ill. Dec. 20, 2012).

Overall, the Court finds that the ALJ's credibility determination contains sufficient errors to require reversal in this case. Plaintiff's motion for summary judgment on that basis is granted.

## 2. Remaining Arguments

In addition to reconsidering the credibility finding, the ALJ should also take the opportunity on remand to better explain the record regarding Dr. Brilliant's opinion. Dr. Brilliant opined in both May and September 2010 that Plaintiff has significant mental limitations that render her incapable of full-time, competitive employment, even at an unskilled level. (R. 433-36, 554). According to Dr. Brilliant, Plaintiff has no useful ability to: remember work-like procedures; understand, remember and carry out very short and simple instructions; maintain attention for two-hour segments; maintain regular attendance and be punctual; sustain an ordinary routine; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace; respond appropriately to changes in a routine work setting; or deal with normal work stress. (R. 434-35). She also has marked restrictions in her activities of daily living, marked difficulties in maintaining social functioning, and constant deficiencies of concentration, persistence or pace, (R. 436), along with sleep problems, "difficulty focusing and concentrating, difficulty following instructions," and poor motivation. (R. 554).

The ALJ did not discuss Dr. Brilliant's specific findings, but agreed with the ME's assessment that there is "no support for [such] severe limitations in the psychiatric medication management progress notes." (R. 25). In adopting the

ME's opinion, the ALJ stressed that she is a "specialist, is familiar with the disability program, and has had the opportunity to review and evaluate the entire record." (*Id.*). Yet the ALJ said nothing about the fact that the ME is a non-examining psychologist, whereas Dr. Brilliant is a psychiatrist who has regularly treated Plaintiff for some 7 1/2 years. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (Among other things, "[a]n ALJ must consider the length, nature, and extent of the treatment relationship [and] the physician's specialty.").

Moreover, neither the ALJ nor the parties seem to have realized that Dr. Brilliant's last official treatment note is dated June 18, 2009. (R. 549). Thereafter, Plaintiff started treating at Aunt Martha's with a different physician whose name and specialty are unknown. The ALJ clearly rejected Dr. Brilliant's opinion, but assigned no weight to the opinions from this other treater. *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) ("Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."). These discrepancies may not ultimately change the ALJ's findings regarding the medical evidence, but they should nonetheless be clarified and resolved.

The ALJ should also address Plaintiff's obesity, which was routinely documented in the medical records (throughout 2010, her BMI was 50 or more). (R. 283, 188, 291, 296, 448, 449, 453). The Seventh Circuit has made it clear that "[a]n ALJ must factor in obesity when determining the aggregate impact of an applicant's impairments," and that this duty exists even where Plaintiff "failed

to provide evidence of limitations" relating to her obesity. *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012).

## **CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment is granted. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: May 21, 2013

_____
SHEILA FINNEGAN
United States Magistrate Judge